**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-6489**

DOUGLAS FAUCONIER,

Plaintiff - Appellant,

v.

HAROLD W. CLARKE, Director for the Department of Corrections; JEFFREY N.
DILLMAN, Warden of Powhatan Correctional Center; LUKE ISAIAH BLACK,
Institutional Programs Manager; LAKENESHA SPENCER, Programs Assignment
Reviewer,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  T. S. Ellis, III, Senior District Judge.  (1:14-cv-01692-TSE-JFA)

Submitted:  June 1, 2020                    Decided:  July 20, 2020

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion.  Judge Niemeyer
wrote the opinion, in which Judge King joined.  Judge Wilkinson wrote a dissenting
opinion.

John J. Korzen, Hayley F. Degnan, Third-Year Law Student, Olivia G. Doss, Third-Year
Law Student, Shameka C. Rolla, Appellate Advocacy Clinic, WAKE FOREST
UNIVERSITY SCHOOL OF LAW, Winston-Salem, North Carolina, for Appellant.  Mark
R.  Herring, Attorney General, Victoria N. Pearson, Deputy Attorney General, Margaret
O'Shea, Senior Assistant Attorney General, Toby J. Heytens, Solicitor General, Martine

E. Cicconi, Deputy Solicitor General, Michelle S. Kallen, Deputy Solicitor General, Zachary R. Glubiak, John Marshall Fellow/Attorney, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

NIEMEYER, Circuit Judge:

For years, Douglas Fauconier, an inmate in the custody of the Virginia Department of Corrections (the "VDOC"), performed various jobs while in prison, despite suffering from myasthenia gravis, a neuromuscular disease that had, from time to time, required his hospitalization. Moreover, Fauconier performed these jobs "competently" and without any accommodation. Typically, after returning from a hospitalization, VDOC officials simply let Fauconier resume his then-current job.

When Fauconier returned from a short hospitalization in October 2010, however, he was not allowed to resume his job but was instead required to reapply for it. His application was then rejected on the basis that the "Work Code D" medical classification that had been assigned to him prior to this hospitalization precluded his employment in *any* prison job.

After unsuccessfully pursuing the VDOC's administrative process to challenge this prohibition on his employment, Fauconier commenced this action pro se against Harold W. Clarke, Director of the VDOC, and three other VDOC officials, alleging that the defendants, in denying him a job, violated his rights under Title II of the Americans with Disabilities Act ("ADA") and the Fourteenth Amendment. After a protracted procedural course, the district court dismissed Fauconier's complaint on the grounds that (1) his claims were time-barred by the applicable statutes of limitations; (2) he failed to state a claim for which relief could be granted under either the ADA or 42 U.S.C. § 1983 for his constitutional claim; (3) his claims for damages were, in any event, barred by Eleventh Amendment immunity and qualified immunity; and (4) his request for injunctive relief had become moot when he was transferred to another prison.

3

From the district court's order of dismissal, Fauconier filed this appeal, and we appointed counsel to represent him.

For the reasons that follow, we conclude that the district court erred in dismissing (1) Fauconier's ADA claims for damages against the defendants in their official capacities and (2) his ADA and equal protection claims for injunctive relief against Clarke in his official capacity. Otherwise, we affirm.

I

Fauconier has been a VDOC inmate since 2004. While at the Wallens Ridge State Prison, he was employed as a cart-pusher, and while at the Powhatan Correctional Center, he was employed as a cafeteria worker and as a janitor (referred to as a "houseman"). In these jobs, Fauconier performed a range of physical tasks, including "serving his peers meals during mealtimes" and "clean[ing] specific areas within the living quarters where he and other prisoners were imprisoned." He has alleged that he performed these jobs "competently" and without any accommodation for his medical condition. In a pro se memorandum filed with the district court, Fauconier explained that he had been diagnosed in 2006 with a neuromuscular disease, which had led to his classification as a "Work Code D" inmate.

On October 14, 2010, while Fauconier was at the Powhatan Correctional Center working as a houseman, he was hospitalized for approximately 24 hours. Upon his return to Powhatan, however, he was required to reapply for his houseman position and then was "automatically disqualified" from that position because of his "Work Code D" medical

4

classification, which he had received even before the October 2010 hospitalization. Fauconier alleged that "prior to the October 14, 2010 [hospital] admission, whenever [he] was admitted to [the hospital], he was always returned to his job assignment upon returning" to the prison. Moreover, he alleged that "[t]here was no change in [his] medical status or classification on account of [the October 2010] hospitalization."

Fauconier thereafter applied for several other jobs, but each application was uniformly and automatically rejected based on his "Work Code D" medical status. These included applications for a "Game-Man" position, denied on June 26, 2012, with the comment "Medical Work code D — per policy"; an application for a "Band Room Assistant" position, denied on January 8, 2013, with the comment "Medical Work Code 'D'"; an application for a "Game Issuer" position, denied on January 8, 2013, with the comment "Medical Work Code 'D'"; and an application for a janitor position, denied on October 25, 2013, with the comment "Medical Work Code D." The criteria for assigning the Work Code D status to an inmate, however, were never explained and are not in the record.

Five days after the rejection of his last application, Fauconier submitted an informal complaint to prison officials alleging that the "department's prison employment eligibility criterion continuously denie[d] [him] the opportunity to obtain employment because of [his] medical classification." On November 4, 2013, a Powhatan Correctional Center official responded:

> Your medical work code is "D." Medical work code "D" means no work, making you ineligible for all jobs. Your medical work code is set by the

5

doctor. Please consult the doctor about the reasoning behind this classification. Action was in accordance with [Operating Procedure 841.2].

Within two weeks, Fauconier filed a formal grievance reiterating his arguments. Specifically, he explained that he was "not bed-ridden, and [could] move around [the prison] with no serious impediments." The Warden responded to the grievance, ruling that it was "unfounded." He explained that prison officials had properly applied Operating Procedure 841.2 to deny Fauconier employment based on his Work Code D medical status.

Fauconier then appealed the Warden's decision to the Regional Administrator, who, on January 8, 2014, upheld the decision, stating that "[Fauconier's] grievance [was] *unfounded*." The Administrator also advised, "[T]his is your *last level* of appeal. You have exhausted all administrative remedies."

In his appeals within the prison system, Fauconier asserted that he was "clearly qualified to perform any job offered by [the VDOC] to prisoners" and "with or without reasonable modifications to rules, policies, etc., [he] would clearly be able to participate in any work program." He emphasized that he had received "satisfactory or better job performance reviews" when he was allowed to work and that, since 2010, he had been "able-bodied enough to attend and graduate from Business Software Applications, and enroll in print school," where his "disability ha[d] neither prevented [him] from attending nor functioning well."

In October 2014, Fauconier was transferred to the Augusta Correctional Center, another VDOC prison facility, as the Powhatan Correctional Center was slated for closure.

Sometime after his transfer, Fauconier was designated as having Work Code C medical status, which, according to the VDOC, allows inmates to engage in "light work."

On December 3, 2014, Fauconier, acting pro se, commenced this action, naming as defendants Director Clarke and three officials of the Powhatan Correctional Center. He alleged that the defendants had violated his rights under Title II of the ADA and 42 U.S.C. § 1983, premised on a violation of the Fourteenth Amendment. Fauconier claimed that, as a result of the defendants' "policies and actions[,]" "he has been automatically disqualified from seeking any employment as a prisoner . . . due to his medical classification; a status bestowed upon him because he is disabled." Fauconier sought, among other relief, monetary damages and an injunction "ordering the defendants . . . to end their discrimination against [him] because of his disability."

The district court sua sponte dismissed Fauconier's complaint under 28 U.S.C. § 1915A for failure to state a claim. Construing the complaint as raising claims under only the Due Process Clause and Title II of the ADA, the court concluded (1) that the complaint stated "no claim of constitutional dimension" because prisoners have no due process right to participate in prison employment programs and (2) that the ADA claim was barred by Eleventh Amendment immunity.

Fauconier appealed the district court's decision, arguing mainly that the district court erred in failing to address several viable claims that he had asserted, including a claim under the Equal Protection Clause and a request for injunctive relief. We agreed and vacated the district court's judgment, remanding the case to the district court to address

those claims in the first instance. *See Fauconier v. Clarke*, 652 F. App'x 217 (4th Cir. 2016) (per curiam).

On remand, the defendants filed a motion to dismiss raising numerous arguments, and the district court granted the motion in its entirety, relying on several alternative grounds. *First*, the court concluded that Fauconier's ADA and § 1983 equal protection claims were time-barred by the applicable statutes of limitations. *Second*, the court concluded that Fauconier failed adequately to allege violations of either the ADA or the Equal Protection Clause. Moreover, based on its conclusion that Fauconier had failed to plead a violation of the Fourteenth Amendment, the court also concluded that "[t]o the extent that Fauconier assert[ed] official-capacity claims for damages under Title II of the ADA, the defendants [were] entitled to Eleventh Amendment immunity because the claims [were] not tied to a properly-alleged constitutional violation." *Third*, the court determined that several claims failed to state cognizable bases for granting either damages or injunctive relief. Additionally, with respect to injunctive relief, the court concluded that Fauconier's claim was moot in light of his transfer to a different VDOC facility. And *fourth*, the court concluded that the defendants were entitled to qualified immunity with respect to the damages claims against them in their individual capacities because any right that had been violated was not "clearly established."

From the district court's order of dismissal dated March 20, 2018, Fauconier filed this appeal.

8

## II. Statutes of limitations

Fauconier contends first that the district court erred in concluding that the applicable statutes of limitations barred his claims.

The district court concluded that because neither Fauconier's § 1983 equal protection claim nor his ADA claim was specifically governed by a statute of limitations, the court was required to "borrow the state statute of limitations that applie[d] to the most analogous state-law claim." *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011). Thus, for Fauconier's § 1983 equal protection claim, the court borrowed the two-year limitations period from Virginia's personal injury statute. *See Owens v. Okure*, 488 U.S. 235, 240–41 (1989) (noting that the limitations period from a State's general personal injury statute applies to § 1983 claims); Va. Code Ann. § 8.01-243(A) (providing that the statute of limitations period for personal injury actions in Virginia is "two years after the cause of action accrues"). And for Fauconier's ADA claim, the court borrowed the one-year limitations period from the Virginians with Disabilities Act. *See A Soc'y Without A Name*, 655 F.3d at 348 (affirming that, though the issue was undisputed by the parties, "the one-year limitations period in the [Virginians with Disabilities Act] applies to ADA claims brought in Virginia"). The court then concluded that both of Fauconier's claims accrued when he was first put on notice that he was prohibited from participating in work programs based on his medical work code status. Thus, it determined that Fauconier's claims accrued, at the very latest, by June 2012, when his application for a "Game-Man" position was denied with the explanation, "Medical Work code D — per

policy." Because Fauconier's complaint was filed on December 3, 2014 — well over two years later — the court concluded that his claims were time-barred.

Fauconier argues first that the district court erred in determining the accrual date with respect to both his ADA and § 1983 equal protection claims because it failed to recognize that each refusal to hire him constituted a discrete act triggering a separate limitations period. *Cf. Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (noting that, in the context of claims brought under Title VII of the Civil Rights Act of 1964, "each retaliatory adverse employment decision [including a refusal to hire] constitutes a separate actionable unlawful employment practice" (cleaned up)). The defendants agree with Fauconier on this point. Accordingly, we consider Fauconier's limitations arguments in light of the VDOC's last refusal to hire him — October 25, 2013, when VDOC officials rejected his application for a janitor position.

Because Fauconier filed his complaint in December 2014, well within two years after October 25, 2013, we agree with the parties that his § 1983 equal protection claim was filed within the relevant two-year limitations period and therefore was timely. Indeed, Fauconier's § 1983 equal protection claim was timely with respect to any refusal by the VDOC to hire him within the two-year period prior to the commencement of this action.

Fauconier's ADA claim, however, was not filed within one year of the October 25, 2013 accrual date. Fauconier presents two alternative arguments for asserting that his ADA claim was nonetheless timely filed. *First*, he contends that the district court erred in concluding that the Virginians with Disabilities Act provided the relevant limitations period. He maintains that because, in his view, his ADA claim was made possible by the

10

ADA Amendments Act of 2008, his claim is instead governed by the four-year "catch-all" statute of limitations set forth in 28 U.S.C. § 1658(a), which applies to actions arising under federal statutes enacted after December 1, 1990. *Second*, he contends that even if the one-year statute of limitations period is applicable, the running of that period should have been tolled while he proceeded through the prison's internal administrative process. And if the running of the limitations period were tolled for the 70 days between Fauconier's first administrative claim filed on October 30, 2013, and the Regional Administrator's denial of his claim on January 8, 2014, his ADA claim would have been timely filed.

We conclude that the running of the limitations period for Fauconier's ADA claim should have been tolled for the 70-day period during which Fauconier proceeded through the VDOC's administrative process and therefore that his claim was timely even under the one-year limitations period. Therefore, we need not determine which limitations statute was applicable to his ADA claim.

The Prison Litigation Reform Act ("PLRA"), which applies to suits by prisoners, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, *or any other Federal law*, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (emphasis added). And this exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Thus, we conclude that Fauconier's ADA claim, brought under a federal statute and challenging the enforcement of prison employment policies, was subject to the PLRA's exhaustion

11

requirement. *Accord O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060–61 (9th Cir. 2007) ("The plain language of the PLRA, as well as Supreme Court . . . precedent, lead us to conclude that exhaustion is required for ADA . . . claims"); *see also Jones v. Smith*, 266 F.3d 399, 400 (6th Cir. 2001) (affirming the dismissal of a prisoner's complaint under the ADA for failure to exhaust administrative remedies as required by the PLRA).

And in *Battle v. Ledford*, 912 F.3d 708 (4th Cir. 2019), we concluded that because the PLRA requires administrative exhaustion, application of federal equitable tolling principles is appropriate to account for the time prisoners spend exhausting their administrative remedies. *Id.* at 718–20. Such equitable tolling applies, however, only when the prisoner shows "(1) that he ha[d] been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Id.* at 718 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). In *Battle*, we found equitable tolling appropriate because the plaintiff had in fact diligently pursued his § 1983 claim through the prison administrative process and, in view of the exhaustion requirement, he "face[d] a complete and absolute barrier to litigation of any § 1983 claim" during those administrative proceedings. *Id.* at 719. Explaining the logical necessity for such a conclusion, we stated that "refusal to toll limitations during the PLRA's mandatory exhaustion period would trap prisoners in a 'catch-22': one who files suit prior to exhausting administrative remedies risks dismissal based upon § 1997e [of the PLRA]; whereas the prisoner who waits to exhaust his administrative remedies risks dismissal based upon untimeliness." *Id.* at 718 (cleaned up).

While *Battle*'s holding was made in the context of a § 1983 claim and Fauconier seeks tolling with respect to an ADA claim, the ADA is nonetheless a "Federal law" subject to the PLRA's exhaustion requirement, 42 U.S.C. § 1997e(a), and therefore *Battle*'s rationale for tolling the limitations period pending exhaustion of administrative remedies of prisoners' § 1983 claims also applies to prisoners' ADA claims.

In this case, Fauconier adequately demonstrated the requirements for federal equitable tolling. His complaint indicates (1) that the VDOC last refused to hire him on October 25, 2013; (2) that he initiated the internal grievance process promptly by filing an informal grievance five days later, on October 30, 2013; and (3) that he followed the internal process diligently until the Regional Administrator concluded on January 8, 2014, that the claim was "unfounded." Because the PLRA's mandatory exhaustion requirement barred him from filing this suit until the conclusion of administrative proceedings and because Fauconier pursued the exhaustion of administrative remedies diligently, the running of the limitations period for Fauconier's ADA claim should have been tolled during the period from October 30, 2013 to January 8, 2014, meaning that the claim was timely even under a one-year limitations period.

At bottom, we conclude that Fauconier's ADA and § 1983 equal protection claims were both timely filed.

## III. Failure to state a claim

Fauconier next contends that the district court erred in concluding that his complaint failed to state a plausible claim under either Title II of the ADA or the Equal Protection

13

Clause. With respect to his ADA claim, he argues that he is disabled because of "a chronic autoimmune disease and a record of episodic hospitalizations due to that disease," and, even if he may not have effectively alleged a "disability," he has surely alleged that the VDOC "clearly regarded him as disabled." VDOC officials uncontrovertibly denied him jobs because of his medical classification, as that was the only reason they provided to justify Fauconier's exclusion from prison employment. And as to his § 1983 equal protection claim, Fauconier argues that his complaint sufficiently alleged that "[h]e was treated differently from similarly situated individuals who were allowed to work" and that this disparate treatment was not justified.

The pleading requirements for surviving a Rule 12(b)(6) motion are well established. "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" in the sense that the complaint's factual allegations allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Moreover, "where, as here, there is a pro se complaint raising civil rights issues," "liberal construction of the pleadings is particularly appropriate." *Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) (cleaned up).

With these principles in hand, we now turn to address Fauconier's claims under the ADA and the Equal Protection Clause.

## A. ADA claim

Title II of the ADA provides that no qualified individual shall, "by reason of [a] disability," be denied the benefits of public "services, programs, or activities" or be subject to discrimination by a public entity. 42 U.S.C. § 12132. The term "disability" is defined by the Act to mean "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or "being regarded as having such an impairment." *Id*. § 12102(1). And the Act further provides that an individual is "regarded as having" a qualifying impairment "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or *perceived physical or mental impairment* whether or not the impairment limits or is perceived to limit a major life activity." *Id*. § 12102(3)(A) (emphasis added). Thus, to state a cause of action under Title II, an individual must plausibly allege (1) that he has a disability or has been regarded as having a disability; (2) that he is otherwise qualified to receive the benefits provided by a public entity; and (3) that he was denied those benefits or was otherwise discriminated against on the basis of his disability. *See Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018). We conclude that Fauconier has plausibly alleged facts in his complaint satisfying all three requirements, particularly when given the benefit of liberal construction that we afford to pleadings filed by pro se plaintiffs.

The complaint alleged (1) that Fauconier was hospitalized on October 14, 2010, as he had been on other occasions, to receive treatment for a medical condition; (2) that when he returned from the hospital and sought to continue his prison job, he was denied the job as well as other positions thereafter, even though he was well able to perform the relevant

15

tasks for those positions; and (3) that the reason the VDOC gave for denying him prison jobs after his October 2010 hospitalization was his medical classification. The complaint supported these facts by attaching an exhibit in which the VDOC explained why Fauconier was denied prison jobs: "Your medical work code is 'D.' Medical work code 'D' means no work, making you ineligible for all jobs." Indeed, in their motion to dismiss Fauconier's complaint, the defendants acknowledged:

> In 2010, Fauconier was removed from an institutional job assignment *because he was deemed medically unfit to work.* Subsequent job applications were also denied on the grounds that *his medical condition precluded institutional employment.*

(Emphasis added).

The defendants argue that the complaint failed to include sufficient information to determine whether Fauconier's medical condition constituted a qualifying disability under the ADA. But they do not address his argument that, at the very least, VDOC officials *regarded* him as disabled, as reflected in their statement that persons with a medical condition such as Fauconier's are "ineligible for all jobs." Thus, the complaint contains enough information to plausibly allege that VDOC officials, relying on Fauconier's medical classification, regarded him as having a disability that made him unable to work, thus satisfying the first element of an ADA claim.

The complaint also alleged adequately that Fauconier was otherwise qualified to participate in the prison work program. It alleged that he worked at numerous jobs at the prison and did them well. Specifically, Fauconier asserted that he received "satisfactory or better job performance reviews" even though he suffered from the same medical

16

condition prior to his October 2010 hospitalization. In addition, the complaint alleged that, following Fauconier's prior hospitalizations, he had always been allowed to return to his then-current job, which he had performed competently. It further alleged that his medical classification did not change after his October 2010 hospitalization and that he remained well able to perform the job that he had been performing, a "houseman." In short, Fauconier plausibly alleged that he satisfactorily performed jobs with similar requirements in the past and that nothing about his ability to do so changed as a result of his October 2010 hospitalization, which lasted no more than a day.

Finally, the allegations adequately support the inference that VDOC officials denied Fauconier prison employment because they regarded him as disabled. Indeed, they expressly relied on his *medical* classification, explaining that he was "ineligible for all jobs" because of the medical condition underlying that classification.

At bottom, we conclude that Fauconier plausibly alleged a violation of Title II of the ADA.

## B. Equal protection claim

The Equal Protection Clause, which prohibits States from denying persons "the equal protection of the laws," U.S. Const. amend. XIV, § 1, "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike," *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). And to state a claim for violation of the Clause, a plaintiff must plausibly allege first "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional

17

or purposeful discrimination." *Martin*, 858 F.3d at 252 (cleaned up). But that showing does not secure the claim, as the plaintiff must also plausibly allege that the disparity was not justified under the appropriate level of scrutiny. *Id.* To account for the unique health and welfare concerns in the prison context, our review of a plaintiff's challenge to a prison decision or policy is more demanding, as we "accord deference to the appropriate prison authorities." *Turner v. Safley*, 482 U.S. 78, 85 (1987). Under this deferential standard, the prisoner must allege that "the disparate treatment [was not] reasonably related to any legitimate penological interests." *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002) (cleaned up). And this evaluation is, in turn, guided by the factors set forth in *Turner*, 482 U.S. at 89–91. In particular, as we explained in *Veney*:

> Three of the four [*Turner*] factors are relevant to [an] equal protection claim. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. Second, a court must consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* at 90. Third, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* at 90–91 ("This is not a 'least restrictive alternative' test: prison officials need not set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.").

293 F.3d at 732 (cleaned up).

Against these demanding requirements, Fauconier's complaint is, to be sure, somewhat thin, even as we recognize that he proceeded pro se in drafting it. Nonetheless, he did allege that he was treated differently than others purportedly similarly situated. His complaint states that when he returned from hospitalization, he was required to reapply for the job he had held, affording prison officials the opportunity to deny his application on

18

the basis of his medical status. He alleged that this process was different from the way two other inmates were treated. Specifically, he explained that at least two other inmates, who are named in the complaint, returned from hospitalization "[o]n multiple occasions" but were not required to reapply for their houseman positions. They were simply allowed to resume working at the jobs they had held prior to their hospitalizations. And the complaint alleged more broadly, "comparing [his] case to the myriad of other cases of similarly situated prisoners at [Powhatan Correctional Center], in this instance, [he] was clearly treated differently." These allegations implicate the heart of the protection afforded by the Equal Protection Clause.

The district court reasoned that the absence of any allegation that the comparators were classified with Work Code D medical status made Fauconier's comparison an inappropriate one, and the defendants argue along similar lines. But Fauconier was not required to allege that his proffered comparators also had the Work Code D medical status. Rather, it was sufficient for him to allege that, like him, the two comparators had been hospitalized "multiple" times but were nonetheless able to perform their prison jobs. Unlike Fauconier, however, the comparators were allowed to return to their prison jobs without the necessity of applying for them. Moreover, Fauconier also alleged by implication that his disparate treatment was not an error but deliberate, as he continued to apply for several other jobs and was rejected for each because of his medical status.

In addition to disparate treatment, Fauconier's complaint also alleged the lack of a legitimate justification for the VDOC's blanket application of Work Code D medical status to deny employment to all persons with that status. Specifically, although the VDOC has

19

a legitimate penological interest in protecting the health and welfare of those in its custody, Fauconier plausibly alleged that its categorical exclusion of Work Code D inmates from employment was insufficiently calibrated to protect that interest. Neither of the parties describe the criteria for assigning an inmate the Work Code D medical status or what such status signifies in terms of an inmate's physical condition. In addition, although the defendants confirm that inmates with Work Code D status are not *permitted* to work, they do not explain the connection between the designation and an inmate's *ability* to work. Yet, Fauconier's complaint alleged that, notwithstanding his classification as a Work Code D inmate, he did in fact satisfactorily perform the job of houseman before his brief October 2010 hospitalization. And it further alleged that, after that hospitalization, he was still able to perform the same tasks at the same level. These allegations thus imply irrationality insofar as the medical classification policy did not operate to deny Fauconier work as a houseman before his hospitalization but did so after his return, despite the lack of any change in his ability or the requirements of the job. Indeed, Fauconier's allegations suggest that he worked in several different jobs while assigned the Work Code D status and consistently received satisfactory reviews. Yet, despite his demonstrated ability to perform in a variety of positions, the Work Code D medical status "*automatically disqualified [him]* from seeking any employment as a prisoner," and his applications for at least four other jobs with differing requirements were accordingly rejected. (Emphasis added).

Taking Fauconier's allegations as true, as we must, it is at least plausible that the VDOC's policy of categorically restricting inmates with Work Code D medical status from "all jobs" was not rationally connected to its interest in protecting inmate health and

20

welfare. Moreover, as to the other *Turner* factors, the fact that Fauconier was previously employed with Work Code D medical status suggests both that he could work with minimal impact on prison operations and that there were reasonable alternatives to the VDOC's categorical denial of employment to Work Code D inmates. We therefore conclude that the allegations of Fauconier's complaint plausibly satisfied each of the relevant *Turner* factors.

Thus, particularly when we apply a liberal construction to Fauconier's pro se complaint, we find that it sufficiently alleged an equal protection claim.

## IV. Eleventh Amendment immunity

The district court dismissed all damages claims against the defendants *in their official capacity* on the ground that the defendants were immune under the Eleventh Amendment, which generally bars actions for damages against unconsenting States. The Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. And the Supreme Court has held that the Amendment renders "an unconsenting State . . . immune from suits brought in federal courts" not only by citizens of another State but also by citizens of the unconsenting State. *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). But it has also recognized that this immunity may be abrogated by an appropriate act of Congress. *See Board of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).

21

Fauconier's damages claims against the defendants — state officials sued in their official capacity — amount to claims against the State. Specifically, because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," it is "no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Moreover, whereas 42 U.S.C. § 1983 permits suit against "every person" who deprives an individual of his or her rights under color of state law, neither States nor state officials acting in their official capacities constitute "persons" within the meaning of the statute when sued for monetary relief. *Id.*

Consequently, we affirm the district court's order dismissing Fauconier's § 1983 equal protection claim for damages, based on Eleventh Amendment immunity.

The analysis for Eleventh Amendment immunity for claims under the ADA, however, is different, as such immunity was purportedly abrogated by Congress. In enacting Title II of the ADA, Congress made it specifically applicable to the States and state entities, such as state prisons. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). And while the States are generally immune from private damage actions by reason of the Eleventh Amendment, the Supreme Court in *United States v. Georgia* held that "insofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." 546 U.S. 151, 159 (2006).

In this case, therefore, because Fauconier has plausibly alleged violations of both Title II of the ADA and the Fourteenth Amendment, the defendants are not entitled to Eleventh Amendment immunity at this juncture. Thus, we vacate this aspect of the district

22

court's Eleventh Amendment immunity ruling, permitting Fauconier's ADA claims for damages against the defendants *in their official capacity — i.e.*, effectively, claims made against the State — to proceed.

## V. Qualified immunity

The district court dismissed all damages claims against the defendants *in their individual capacity* because of qualified immunity.

"Qualified immunity shields federal and state officials [individually] from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). And for a right to be clearly established, it must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted).

In this case, Fauconier has not and cannot establish that every reasonable official would have believed that the officials' actions here, which were apparently consistent with the VDOC's policy, were unlawful. And none of Fauconier's allegations establish that the defendants were "plainly incompetent or . . . [that they] knowingly violate[d] the law." *al-Kidd*, 563 U.S. at 743 (citation omitted). If, as it appeared to the defendant officials when confronted with Fauconier's Work Code D status, there were no circumstances under which it would be safe or possible for Fauconier to work, then the defendants did not violate clearly established law by excluding Fauconier from prison employment on that basis.

23

Accordingly, we affirm the district court's dismissal of Fauconier's claims for damages against the defendants in their individual capacities.

## VI. Injunctive relief

Finally, Fauconier challenges the district court's ruling dismissing his claims for injunctive relief as moot. The court reasoned that Fauconier's transfer out of Powhatan Correctional Center mooted his claims as to the three defendants employed there because those officials no longer had authority over Fauconier's applications for employment. And as to VDOC Director Clarke, the court reasoned that, while he remains Director and thus continues to oversee VDOC policies, Fauconier's claim "is predicated not on the text of VDOC operating procedures but rather on the allegedly improper and discriminatory actions of officials" that took place while Fauconier was housed at Powhatan Correctional Center.

We agree with the district court's reasoning as to the three defendant officials who worked at Powhatan Correctional Center and therefore affirm the court's conclusion that Fauconier's claims for injunctive relief against them are moot. We do not agree, however, with the same ruling as to VDOC Director Clarke.

While Fauconier did, in his complaint, challenge the discriminatory actions of officials at the Powhatan Correctional Center, he also alleged that he was challenging the VDOC's "*policies* and actions." (Emphasis added). Moreover, he alleged that the VDOC's policies excluded him from "all work programs and all apprenticeship programs offered by [Powhatan Correctional Center] *and* [the VDOC,] both public entities."

24

(Emphasis added). While Fauconier has been reassigned to another facility within the VDOC, his complaint sufficiently alleged that the new facility was also subject to the same policies as Powhatan Correctional Center — policies overseen by Clarke — and that Fauconier was still subject to the challenged policy. Moreover, although it is undisputed that the VDOC has since reclassified Fauconier as a Work Code C inmate, the VDOC has not "made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000)). Thus, the complaint demonstrates Fauconier's legally cognizable interest in seeking prospective injunctive relief to prevent enforcement of the policy he challenges. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

The defendants argue for a different result, relying on language from our decision in *Incumaa v. Ozmint*, 507 F.3d 281 (4th Cir. 2007). In *Incumaa*, an inmate challenged policies that were only in place at a maximum security unit where the inmate was no longer housed and had not been housed for over two years. *Id*. at 282. As a result, the court refused to provide an opinion that "would [have been] advisory in the truest sense," given that the policies applicable to the maximum security unit and the facility where the inmate then resided were "similar, but not identical." *Id*. at 289. But here, the VDOC policy that Fauconier challenges allegedly applies across all VDOC facilities.

In short, we conclude that the district court correctly dismissed Fauconier's claims for injunctive relief against the three officials at Powhatan Correctional Center but erred in dismissing them against defendant Clarke in his official capacity.

25

\* \* \*

For the reasons given, the judgment of the district court is

AFFIRMED IN PART,
REVERSED IN PART,
AND REMANDED.

WILKINSON, Circuit Judge, dissenting:

One of the oldest axioms in our profession is that "hard cases make bad law." *N. Secs. Co. v. United States*, 193 U.S. 197, 400 (1904) (Holmes, J., dissenting). This is one of those cases. It draws the federal courts into the minutiae of state penal administration and undermines the deferential nature of the rational basis test, a bedrock legal rule that protects our Constitution's federalist structure. Put plainly, the majority's ruling is destructive of the balance between federal and state governments.

Deference to anyone may be less in fashion in the federal courts these days. There was a time, however, when jurists would recognize that our review of the plaintiff's Equal Protection Clause claim was a doubly deferential one. The plaintiff is a member of no suspect classification and the State has infringed no fundamental right, so searching judicial review is inappropriate. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) (explaining when courts must apply heightened scrutiny to government actions under the Equal Protection Clause). *But see* Majority Op., *ante* at 19 (asserting without support that this case "implicate[s] the heart of the protection afforded by the Equal Protection Clause"). Rather, the State has classified prisoners on the basis of medical conditions, which is presumptively permissible and reviewed under traditional—and deferential—rational basis scrutiny. *See Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1267 (4th Cir. 1995).

The rational basis test exists for a reason. It keeps the federal courts out of places where they do not belong. It requires respect for the State's exercise of its historic police powers. The defendants' policy of medical classifications is "presumed to be valid and will

27

be sustained if the classification drawn by the [policy] is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440. Further, "a classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Heller v. Doe*, 509 U.S. 312, 320 (1993) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). Moreover, "the 'burden is on the one attacking the [policy] to negative every conceivable basis which might support it.'" *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012) (quoting *Doe*, 509 U.S. at 320).[1]

Government actions reviewed under the rational basis test are thus "overwhelmingly likely to be upheld" because of the deference courts must give them. Mario L. Barnes & Erwin Chemerinsky, Essay, *The Once and Future Equal Protection Doctrine?*, 43 Conn. L. Rev. 1059, 1077 (2011). And the deference that inheres in the rational basis test is doubled when courts consider a policy in the context of prison administration.

The Supreme Court has put it plainly: "it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures than the administration of its prisons.'" *Woodford v. Ngo*, 548

---

[1] The plaintiff must also show he was treated differently than other similarly situated individuals. *See Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017). The plaintiff's showing with respect to this is insufficient. He points to two fellow inmates he claims were similarly situated to him but treated differently—i.e., that they were allowed to return to their prison jobs without reapplying for them after being hospitalized. Appellant Br. 35–36. But the plaintiff pleads no facts suggesting they were similarly situated. He pleads merely that they too were hospitalized. J.A. 10. But he does not plead that they were afflicted with medical conditions like he was or even that they were Code D inmates. Aside from the fact they were hospitalized, we know nothing about these two individuals or whether they were similarly situated to the plaintiff in any meaningful way.

U.S. 81, 94 (2006) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973)). The Court has warned against what is happening here, namely "unnecessarily . . . perpetuat[ing] the involvement of the federal courts in affairs of prison administration." *Procunier v. Martinez*, 416 U.S. 396, 407 (1974). To implement this command, "courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner." *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002). For a state's integrity is intimately linked to its capacity to operate its own institutions. Take away these managerial responsibilities and there is left less a vibrant organ of self-governance than a hollow shell.

Under rational basis scrutiny in the prison context, a "prison regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The State's policy of medical classifications easily clears this bar.

The majority acknowledges that the State has a legitimate penological interest in protecting the health and safety of its inmates, Majority Op., *ante* at 19–20, as indeed it must. "Prison administrators have . . . [a] duty to take reasonable measures for the prisoners' own safety." *Washington v. Harper*, 494 U.S. 210, 225 (1990). If an inmate were to suffer a serious health reversal while performing work in prison, that would not only be unfortunate on its own terms, but it could also expose the State to potential liability. This is quite wrong. The state has not exhibited here a "deliberate indifference" to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). It has practiced preventive medicine for which the majority now proposes to subject it to a spate of equal protection lawsuits.

29

The means that the State has adopted are well-suited to further its manifest legitimate interest. Doctors assign three relevant codes to inmates upon their incarceration based on their medical conditions and ability to work. *See* J.A. 87. Relevant here: Code A permits full work and carries no activity restrictions; Code C allows light work and rules out strenuous physical activity like weightlifting; Code D prohibits work and sports activities except for walking. *See* J.A. 87. It is entirely rational for the State to rely on the opinions of medical professionals to classify prisoners according to the severity and nature of their health conditions. The plaintiff does not dispute the qualifications of the physicians who made his classification decision, and indeed those physicians are not even parties in this case.

The majority focuses on the inflexible nature of a Code D designation, effectively ruling that prisoners medically diagnosed with serious medical conditions cannot be uniformly barred from working. But the majority's characterization of this system as inflexible is belied by the record. The State's policy calls for regular reviews of an inmate's designation "any time a change of the offender's condition is identified to ensure it reflects the current medical status of the offender." J.A. 86. Prisoners with chronic health conditions are to "be monitored at a minimum of every six months." J.A. 77. More generally, the policy makes clear that a "physician shall change the offender's medical classification code whenever the offender's condition so indicates." J.A. 76. Indeed, the plaintiff's own designation was changed to Code C after an additional examination by a doctor. Consistent with that classification, he is now allowed to work again. The

inflexibility the majority insists makes the State's system devoid of rationality does not even exist under the facts of this case.

Failing to properly apply the doubly deferential standard of review applicable in this case, the majority seeks to substitute its own judgment for that of the medical professionals the State relies on. For the majority, it is irrational to allow doctors to designate some prisoners as categorically unable to work safely after individualized examinations, even though the policy requires doctors to periodically reevaluate the classifications. The majority has a better idea, requiring *another* case-by-case evaluation of each prisoner's ability to work by prison administrators whenever a request to work is made by a Code D inmate. *See* Majority Op., *ante* at 19–21. Prison officials lack not only the resources to make these myriad classification calls, but also the medical expertise to render them. Indeed, that is why we have doctors.

But even that is not enough for the majority. It holds that yet *another* case-by-case evaluation by the federal courts may be necessary whenever a Code D inmate is dissatisfied with a judgment that he is medically unable to work. *Id.* And then we must, somehow, review a doctor's decision that a prisoner cannot safely work. The federal courts are bereft of both the resources and the knowledge to review the volume of classification claims that will surely arise from inmates who wanted one job or another that medical professionals felt ill-advised. *See, e.g.*, *Procunier*, 416 U.S. at 405 (explaining that "courts are ill equipped to deal with the" "complex and intractable" "problems of prison administration," which "are not readily susceptible of resolution by decree").

31

It is the very essence of government that it be able to govern by classifications, which by necessity are over- and under-inclusive to some extent. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271–72 (1979) ("Most laws classify, and many affect certain groups unevenly . . . ."). This is so because "[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69–70 (1913). And "[t]he calculus of effects, the manner in which a particular [policy] reverberates in a society" is "not a judicial responsibility." *Feeney*, 442 U.S. at 272; *see also Doe*, 509 U.S. at 321 ("[C]ourts are compelled under rational-basis review to accept a [state's] generalizations even when there is an imperfect fit between means and ends.").

Ignoring these longstanding legal principles, the majority proposes to replace government by classification with a class-of-one equal protection regime. *See Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603 (2008). But the Supreme Court has emphasized that a class-of-one claim under the Equal Protection Clause is not appropriate for challenges to government policies "which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Id.* The majority's view, followed to its logical extreme, would destroy the ability of prison officials to group prisoners, even after individualized evaluations, based on administrative and operational advantages. The Constitution does not require this.

Of course, every individual pleading of an imperfect fit under the Equal Protection Clause will have its sympathetic aspects, and this case is no exception. Taking the facts pleaded as true, one would naturally respect the plaintiff's desire to have a job, which might

32

assist others within the institution and further the inmate's own rehabilitative aspirations. And if I were free to rule purely on the individual circumstances, and without regard to broader consequences, I would be drawn to plaintiff's argument.

If only it weren't for that pesky little impediment that goes by the name of law. The genius of our Constitution is that it assigns different responsibilities to different actors. And the structure of our founding document has entrusted the administration of state prison systems to our individual states. Unless the states classify according to an impermissible characteristic, like race, federal courts must defer to their decisions on how to group their residents under their laws and policies. Refusing to respect the State's decision to classify prisoners according to a doctor's determination of their medical ability to work undermines the fundamental legal rule that rational basis review must be deferential. And because the rational basis test "completely pervades the legal system by virtue of its combination of substantive review and general applicability," undermining this rule gives the federal courts an opportunity to "intrude into virtually any regulatory sphere" within the purview of state governments. Thomas B. Nachbar, *The Rationality of Rational Basis Review*, 102 Va. L. Rev. 1627, 1629–30 (2016).

Our hammers drive nails through the remnants of dual sovereignty and I wonder when, if ever, the resulting din shall cease. More and more, it seems, the states mean less and less. I respectfully dissent.[2]

---

[2] Because the plaintiff has not pleaded a viable Equal Protection Clause violation, I must analyze the question of whether the Eleventh Amendment bars the plaintiff's ADA claims differently from my colleagues. As the majority recognizes, the Supreme Court has held (Continued)

that "insofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *United States v. Georgia*, 546 U.S. 151, 159 (2006). But the Supreme Court did not decide whether Congress has validly abrogated state sovereign immunity for conduct that violates the ADA in the prison context but not the Fourteenth Amendment. It did, however, establish a framework for courts to use in this context. A court must determine, on a "claim-by-claim basis":

> (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id*.

Neither party has made arguments under this framework. The Fourth Circuit faced a similar situation where the parties had failed to brief this issue in *Kobe v. Haley*, 666 F. App'x 281, 302 (4th Cir. 2016) (per curiam). There, the court declined to dismiss a claim on Eleventh Amendment grounds or to rule on the issue in the first instance. *Id.* (holding that that dismissing a claim under Title II of the ADA on Eleventh Amendment grounds was premature "[p]articularly since [the defendants] have not yet made any argument regarding how the *Georgia* framework would apply to the facts before us"). Likewise, I would remand the plaintiff's ADA claims against the defendants in their official capacity to the district court to address in the first instance under the proper framework. As to the remaining claims, I would affirm the district court.

34