**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-1215**

———————

PATSY TALLEY,

Plaintiff – Appellant,

v.

DALE R. FOLWELL, Individually and in his Official Capacity as Treasurer of the State of North Carolina; LENTZ BREWER; JOHN EBBIGHAUSEN; VERNON GAMMON; DIRK GERMAN; BARBARA GIBSON; LINDA GUNTER; OLIVER HOLLEY; GREG PATTERSON; MARGARET READER; JOSHUA SMITH; CATHERINE TRUITT; JEFFREY WINSTEAD, individually and in their official capacity,

Defendants – Appellees.

———————

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville. Terrence W. Boyle, District Judge. (4:22-cv-00027-BO)

———————

Argued: December 11, 2024                    Decided: April 4, 2025

———————

Before AGEE, QUATTLEBAUM, and RUSHING, Circuit Judges.

———————

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Agee and Judge Rushing joined.

———————

**ARGUED:** Valerie Bateman, NEW SOUTH LAW FIRM, Carrboro, North Carolina, for Appellant. Olga Eugenia Vysotskaya de Brito, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Joshua H. Stein, Attorney General, Mary W. Scruggs, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

QUATTLEBAUM, Circuit Judge:

"There is no such thing as a free lunch."[1] This appeal illustrates this old adage. For over eight years, North Carolina paid Patsy Talley $857 more in monthly retirement benefits than she was supposed to receive. All told, Talley was overpaid to the tune of $86,173.93. When North Carolina finally realized its mistake, it notified Talley that going forward, her monthly benefits would be reduced to recoup the overpayment. Then, it began doing just that. In response, Talley sued, asserting several constitutional theories all premised on North Carolina's failure to provide a hearing before it began reducing her monthly retirement payments. She never denied that she was overpaid or disputed the amount. She instead complained that the way North Carolina went about recouping its overpayment failed to provide her due process rights. The district court dismissed all her claims under Rule 12 of the Federal Rules of Civil Procedure. We agree that Talley failed to plead any plausible claims. So, we affirm.

---

[1] This phrase has an interesting history. It seems to have arisen in the late nineteenth century, when bars provided lunch at no cost to lure in customers who would spend more than the bar's costs of providing lunch in alcohol purchases. *See* Rudyard Kipling, RUDYARD KIPLING'S WEST: AMERICAN NOTES BY RUDYARD KIPLING 19 (Arrell Morgan Gibson ed., 1981) (describing how he discovered "the institution of the 'Free Lunch'" while touring the United States in 1889, in which "[y]ou paid for a drink and got as much as you wanted to eat"); *see also Phoenixania*, THE DAILY PHOENIX, Sept. 6, 1873, Vol. IX, No. 144 ("One of the most expensive things in this city—Free lunch."). Milton Friedman later used the phrase as a book title to describe the economic theory of opportunity costs. *See* Milton Friedman, THERE'S NO SUCH THING AS A FREE LUNCH (1975). Colloquially, the point is simple. Rarely, if ever, do you get something for nothing.

# I.

## A.

Talley retired from the Beaufort County School System in 2008, after teaching in the district for over 25 years. The North Carolina Department of State Treasurer has a Retirement System Division ("RSD"), which in turn has a subdivision called the "Teachers' and State Employees' Retirement System" ("TSERS"). J.A. 16. Talley participated in TSERS, accruing vested retirement benefits while she worked as a teacher. TSERS offers various options through which retired teachers can receive their accrued benefits. Talley chose an option that allowed her to receive "a larger monthly payment than the maximum allowable benefits until the month of her sixty-second birthday, after which point [her] payment amount [would be] decreased by an amount equal to an estimate of [her] social security benefits." J.A. 20. Under this method, her overall income would remain constant even after her retirement benefits decreased because her social security benefits would offset that reduction.

At first, things worked as planned. Talley "received $2,703.34 per month . . .until her 62nd birthday." J.A. 20. After her 62nd birthday, in December 2009, she began to receive a reduced monthly benefits payment from TSERS, as expected. Also as planned, Talley's Social Security benefits made up the difference. But in April of 2010, things began to go awry. At that time, TSERS[2] determined that Talley's monthly payments were $17.90

---

[2] Talley refers to both RSD and TSERS throughout her complaint. With the understanding that these entities are not one and the same, we will use the term TSERS in this opinion to refer to both.

less than they should have been both before and after she turned 62. To rectify this mistake, TSERS paid Talley for the total amount of the underpayments through April 2010. That corrective action itself was fine. But the next month, TSERS made another mistake. This time, it began paying Talley the recalculated "before age 62" amount when it should have sent the recalculated "after age 62" amount. Since the recalculated "before age 62" payment was more than the recalculated "after age 62" payment, Talley was overpaid each month beginning in April of 2010.

This overpayment continued for over eight years. Finally, in August 2018, TSERS realized its mistake. A few months later, the Executive Director of RSD notified Talley by letter that she "had been overpaid in the amount of $86,173.93 . . . ." J.A. 21. And about one month after that, the Deputy Director of Member Services of TSERS notified Talley, again by letter, that her monthly checks would be reduced by $926.35 beginning in April of 2019. In April, Talley was informed by email that she could appeal the reduction.

In response to this email, Talley's lawyer asked that an earlier email from Talley's son to the North Carolina State Treasurer inquiring about the reduction in her pension payments be treated as an appeal. Her lawyer also asked that any reduction in her retirement payments be delayed until the matter was "resolved." J.A. 22. Despite that, in April 2019, Talley began receiving the reduced benefit checks.

On April 24, 2019, Talley was notified that the final agency decision was to reduce her monthly checks by 50%. In June, she filed a petition in the Office of Administrative Hearings to stop the taking of her property "without an opportunity to be heard." J.A. 23. While that administrative proceeding was pending, TSERS agreed to reduce the amount of

4

recoupment each month. Instead of reducing her benefits check by 50% each month, it agreed to reduce it by just 10%. In other words, TSERS did not agree to reduce the total amount it was seeking to recoup, only to recoup at a slower pace.

As part of the administrative proceeding, TSERS and Talley moved for summary judgment. On February 19, 2020, an Administrative Law Judge ("ALJ") granted TSERS' motion for summary judgment and denied Talley's. In its decision, the ALJ found that Talley was overpaid by $86,173.93. It then held that (1) TSERS had a statutory obligation to recoup the overpayment amount under N.C. Gen. Stat. § 143-64.80(b); (2) the overpayment amount could be recouped by offsetting the overpayment against an individual's retirement allowance; (3) "a contested case before the Office of Administrative Hearings in the executive branch is 'not a proper method of challenging the constitutionality of a statute'"; and (4) because there was no dispute of material fact in controversy, Talley's petition should be dismissed. J.A. 65. In this final decision, the ALJ notified Talley that she could appeal the decision to the superior court of the county where she resides. Talley did not exercise this right to appeal.

**B.**

Talley sued the State of North Carolina, TSERS, RSD, State Treasurer Dale Folwell (individually and in his official capacity) and twelve current or former members of TSERS' board, individually and in their official capacities, in federal court. She asserted claims for (1) deprivation of due process under the U.S. Constitution; (2) deprivation of due process under the North Carolina Constitution; (3) deprivation of equal protection and substantive due process under the U.S. Constitution; and (4) deprivation of equal protection and

substantive due process under the North Carolina Constitution. Talley primarily complained that reducing her monthly benefits checks without any sort of pre-deprivation hearing and without any set protocol for how overpayments should be recouped violated her due process and equal protection rights. In her complaint, she purported to bring claims "on behalf of herself and all similarly situated individuals . . . under 42 U.S.C. § 1983 for the deprivation of property and property rights without due process." J.A. 15. But she has yet to file a motion for class certification. Thus, for our purposes, Talley is the only plaintiff in this case.

After defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Talley voluntarily dismissed her claims against the State of North Carolina, TSERS and RSD and her North Carolina Constitution-based claims. That left the individual TSERS Board of Trustees members as defendants on the federal law-based claims. Then, the district court dismissed Talley's claims against the defendants in their official capacities, explaining that Talley's claims did not allege ongoing violations of her rights and did not seek prospective relief. As a result, the court held that the Eleventh Amendment immunized the defendants from those claims. It also dismissed Talley's substantive due process claim, explaining that "the availability of internal review" and the "post-deprivation quasi-judicial hearing" meant that she had received fair procedure and thus failed to state a substantive due process claim. J.A. 83. Next, the district court dismissed her equal protection claim, holding that (1) she had "not alleged the presence of any suspect class or the violation of a fundamental right" and (2) that she had not shown that "treating current employees and retirees differently or reducing overpayment recoupment

6

percentages only for people who 'push back' [was] not rationally related to a legitimate state interest, i.e., fully recouping the overpayment of retirement benefits." J.A. 84. Last, as to Talley's procedural due process claim against the defendants in their individual capacities, the district court held that Talley sufficiently alleged a property interest in "the continued receipt of full benefits prior to a reduction based upon the state's recoupment procedures" and that the process provided to her prior to the initiation of recoupment procedures was constitutionally inadequate. J.A. 81. This allowed the individual capacity procedural due process claim to go forward.

The defendants answered, asserting qualified immunity, among other defenses. They also moved for judgment on the pleadings under Rule 12(c). Around the same time, Talley moved to amend her complaint to add additional plaintiffs.

The district court granted the defendants' Rule 12(c) motion, explaining that "plaintiff [] failed to respond substantively to whether defendants [were] . . . entitled to qualified immunity" and thus waived any arguments she could have otherwise made. J.A. 466. It further held that "even assuming, without deciding, that the lack of pre-deprivation process prior to a reduction in plaintiff's retirement benefit amounts to a violation of her procedural due process right, it is not apparent that such a right was clearly established, and thus defendants are entitled to qualified immunity." J.A. 468.

The district court also denied Talley's motion to amend her complaint. It did so because: (1) Talley moved to amend her complaint nearly four months after the "deadline to amend pleadings and join parties" contained in the scheduling order; (2) the motion itself was procedurally deficient because it did not include the required proposed amended

7

pleading and failed to indicate how the amended pleading differed from the original as required by local rule; and (3) Talley had not shown the requisite good cause for modifying the scheduling order under Federal Rule of Civil Procedure 16(b)(4) to add potential plaintiffs, at least some of which she knew of prior to the expiration of the deadline. J.A. 468–71. The district court also noted that, even if good cause to modify the scheduling order existed, "the proposed new plaintiffs do not allege deprivation of the same property interest," and the benefits complained about by the proposed plaintiffs were "not alleged to be managed by the individual defendants who are . . . members of the TSERS Board." J.A. 470–71.

Talley now appeals: (1) the district court's order granting the individual defendants' Rule 12(c) motion for judgment on the pleadings as to her individual capacity procedural due process claim; (2) the district court's order granting the defendants' Rule 12(b) motion to dismiss as to her official capacity procedural due process claim, her substantive due process claim and her equal protection claim; and (3) the district court's denial of her motion to amend her complaint.[3]

## II.

Talley argues that the district court erred in dismissing her claims. We address each claim in turn before reviewing the district court's denial of Talley's motion to amend.

---

[3] We review the district court's grant of both the defendants' motion to dismiss and their motion for judgment on the pleadings de novo. *See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 375 (4th Cir. 2012).

## A. Procedural Due Process – Official Capacity

Talley first appeals the district court's dismissal of her official capacity procedural due process claims. She argues that the board members violated her procedural due process rights by recouping the overpaid benefits without providing sufficient process. And she specifically complains that she was not afforded a hearing before the defendants began reducing her benefit checks.

But under the Eleventh Amendment, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." U.S. Const. amend. XI. "This immunity has been judicially interpreted to run as well to actions by a state's own citizens" including those brought "against state agents or officials that are in fact actions against the state as the real party in interest." *Indust. Servs. Grp., Inc. v. Dobson*, 68 F.4th 155, 163 (4th Cir. 2023) (cleaned up). However, the Supreme Court has crafted an exception to this immunity "for suits brought against state officials . . . acting in violation of the Constitution . . . ." *Id.* (citing *Ex parte Young*, 209 U.S. 123, 160 (1908)). Under the *Ex parte Young* exception, private citizens may "petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute." *Id.* (internal quotation mark omitted) (quoting *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002)). To successfully bring a claim against a state official in their official capacity for a violation of the Constitution, plaintiffs must "allege an ongoing violation of federal law and seek relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv.*

9

*Comm'n*, 535 U.S. 635, 645 (2002) (cleaned up). Talley argues her official capacity procedural due process claims fall within this *Ex parte Young* exception to Eleventh Amendment immunity.

Talley's arguments have several problems. For starters, as conceded at oral argument, her primary complaint is TSERS' failure to provide her with sufficient process—mostly a hearing—prior to reducing her benefits checks to recoup the overpayment. That alleged failure occurred before she filed her complaint. Thus, it is not ongoing conduct as required by *Ex parte Young*.

Talley responds that even if the failure to provide sufficient process before the offsets began took place in the past, the continued recoupment from each of her monthly pension payments is a "consequence" of the earlier failure to provide pre-deprivation process that is itself an ongoing constitutional violation. And to be sure, "presently experienced harmful consequences of past conduct" can be "ongoing violations of federally protected constitutional rights." *Republic of Paraguay v. Allen*, 134 F.3d 622, 628 (4th Cir. 1998) (collecting cases). For example, an injunction can be issued to stop the ongoing, unequal underfunding of a school district even though the initial funding decision was made in the past. *Papasan v. Allain*, 478 U.S. 265, 282 (1986). An injunction mandating a remedial education plan is permissible to address the ongoing effects of a past policy of racial segregation. *Milliken v. Bradley*, 433 U.S. 267, 288–90 (1977). An injunction can require that a state employee terminated without due process be re-hired because, although the termination took place in the past, he experienced a "continuing violation" of his property rights until he was re-hired. *Coakley v. Welch*, 877 F.2d 304, 306–07 (4th Cir.

10

1989). And an injunction enjoining the collection of taxes is permissible even though the illegal assessment took place in the past because future collection based on the past assessment would violate federal law. *CSX Transp., Inc. v. Bd. of Pub. Works of State of W. Va.*, 138 F.3d 537, 539, 542–43 (4th Cir. 1998).

Talley's claims are not like any of these cases. As explained in *Republic of Paraguay*, for a violation to be ongoing, the officials being sued must be "in violation of federal law at the precise moment when the case was filed." 134 F.3d at 628. Here, the defendants were not in violation of federal law by the time Talley filed her complaint, if they ever were. That's because by that time, the defendants provided the ALJ hearing at which she was able to oppose the recoupment. *See Tri-Cnty. Paving, Inc., v. Ashe Cnty.*, 281 F.3d 430, 436 (4th Cir. 2002) (quoting *Fields v. Durham*, 909 F.2d 94, 97 (4th Cir. 1990)) (stating that "courts must consult the entire panoply of predeprivation and postdeprivation process provided by the state" to "determine whether a procedural due process violation has occurred"). The ALJ hearing did not end in the result that Talley hoped it would. But her dissatisfaction with the outcome of that hearing does not make the hearing deficient, nor does she really argue that it was.

Talley's only real complaint about the ALJ hearing was her inability to raise constitutional issues at the hearing. True, the ALJ noted that "[a]n Administrative Law Judge follows the constitutional rulings of the Judicial Branch but does not make them" in response to Talley's "constitutional argument that she obtained a vested right to retain the overpaid benefits." J.A. 65. But the ALJ also informed Talley in its final decision that she had a right to appeal that decision to the superior court of the county where she resided.

11

She declined to do so. Her decision not to avail herself of the appeals process—through which she could have made her constitutional arguments in state court—does not render the process she received constitutionally deficient. Thus, any recoupment now being pursued by defendants is not an ongoing consequence of an inadequate process.

For all of these reasons, Talley's official capacity procedural due process claims are barred, and we affirm the district court's dismissal of them.

### B. Procedural Due Process – Individual Capacity

Talley also argues that the district court erred in holding that qualified immunity applies to her procedural due process claims against the defendants in their individual capacities. She argues that the "presumptively valid" North Carolina statutes under which the board members acted when recouping the overpayments did not "require[] deprivation of property without constitutionally mandated due process." Op. Br. at 17. And Talley contends that prior caselaw has held that "the taking of property by the government requires pre-deprivation due process." Op. Br. at 20.

To begin, Talley fails to address the district court's statements that she did not make substantive arguments on qualified immunity below. Thus, she likely waived her arguments on this point. *See Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 603 (4th Cir. 2004) (stating that "absent exceptional circumstances, we do not consider issues raised for the first time on appeal").

However, even if Talley did not waive them, her arguments would fail. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the

12

challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). And "[i]n reviewing a district court's denial of qualified immunity, we conduct a two-pronged analysis," asking first "whether the plaintiff has established that a constitutional violation occurred" and second "whether the right at issue was 'clearly established' at the time of the events in question." *Rambert v. City of Greenville*, 107 F.4th 388, 398 (4th Cir. 2024) (quoting *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022)). Courts have discretion over the order in which to address these two prongs. *See id.*; *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). And here, like the district court below, we address prong two first.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up). Ultimately, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. 73, 79 (2017). Thus, "'clearly established law' should not be defined 'at a high level of generality.'" *Id.* (quoting *Ashcroft*, 563 U.S. at 742). Instead, it "must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (cleaned up).

13

Talley's arguments run headlong into two problems. First, as the district court below observed, "[r]arely will a state official who simply enforces a presumptively valid state statute thereby lose her immunity from suit." *Swanson v. Powers*, 937 F.2d 965, 969 (4th Cir. 1991). And North Carolina General Statute § 135-9(b) provides that "any overpayment of benefits or erroneous payments to a member in a State-administered retirement system . . . who is later determined to have been ineligible for those benefits or untitled to those amounts, may be offset against any retirement allowance . . . ." North Carolina law also requires the state to pursue the recoupment of state funds; the state cannot simply forgive the repayment of overpaid funds. *See* N.C. Gen. Stat. § 143-64.80.

Talley claims that these statutes do not immunize the defendants because § 143-64.80(b) says that overpaid benefits may be recouped "by all lawful means available." According to Talley, "by all lawful means available" requires the pre-deprivation hearing she claims she did not receive. She even suggests that § 143-64.80 requires "the filing of a civil action in the General Court of Justice" to recoup overpayments. § 143-64.80(b). She is incorrect on both counts. Section 135-9(b) permits recoupment via an offset against a retirement allowance—making that a "lawful means" available to the defendants. Also, § 143-64.80 says that "all lawful means available" includes, but is not limited to, filing a civil action to recover the money. Thus, filing a civil action is not required. As Talley concedes, these statutes are presumptively valid. They do not on their face mandate that a pre-deprivation hearing be provided, nor do they say that recoupment cannot be sought in the manner that the officials used here. What's more, we are aware of no court that has held North Carolina's recoupment statutes are unlawful or unconstitutional. Accordingly, as in

14

*Swanson*, no "extraordinary circumstances" exist that should compel us to abandon the ordinary rule that "[u]ntil judges say otherwise, state officers . . . have the power to carry forward the directives of the state legislature." *Swanson*, 937 F.2d at 969 (quoting *Lemon v. Kurtzman*, 411 U.S. 192, 208 (1973)).

Second, existing caselaw does not "place[] the . . . constitutional question [here] beyond debate." *Adams v. Ferguson*, 884 F.3d 219, 226–27 (4th Cir. 2018) (internal quotation mark omitted) (quoting *Reichle*, 566 U.S. at 664). Talley's argument that the law clearly establishes the requirement of pre-deprivation due process before the government can take property is too broad. Precedent from the Supreme Court and our court requires that we look more granularly to see whether the law clearly mandates a hearing before the government recoups overpaid retirement benefits. *See White*, 580 U.S. at 79; *see also Ashcroft*, 563 U.S. at 742; *Anderson*, 483 U.S. at 640; *Adams*, 884 F.3d at 227–28. Here, the law does not. In fact, we have found no court addressing these factual circumstances.

It is true that the Supreme Court has held that a pre-deprivation hearing is owed when the individual being deprived of need-based benefits is "on the very margin of subsistence" and when the risk of error surrounding the deprivation is significant. *Mathews v. Eldridge*, 424 U.S. 319, 340, 344 (1976) (citing *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970)). But the Supreme Court has affirmed repeatedly, in opinions to which Talley herself cites, that "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Id.* at 334 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)); *see also Parratt v. Taylor*, 451 U.S. 527, 540–43 (1981) (overruled in part by *Daniels v. Williams*, 474 U.S. 327 (1986)); *Goldberg*, 397 U.S.

15

at 263–64. Rather, it is "flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (internal quotation mark omitted) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). And we know this to be true because *Mathews* and its progeny tell us that even individuals who face total deprivations of non-need-based benefits prior to a hearing may have received constitutionally sufficient process. 424 U.S. at 343 (holding that, in a case involving a recipient of social security, "there is less reason [] than in *Goldberg* to depart from the ordinary principle, established by our decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action"). *Mathews* went on to explain that "[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances." *Id.* at 348.

Further, Talley's claims are different from those in *Mathews*. The benefits offset here to recoup overpayments were not need-based. Nor did Talley face a total deprivation of her benefits, as the *Goldberg* and *Mathews* plaintiffs did. Nor is there any evidence of a great risk of error in calculating the amount to be offset. Indeed, Talley does not claim any error in the offset amount; she just says she should have had a hearing before the offsets began. Thus, when we analyze the right in question here at the appropriate level of specificity, it becomes apparent that the "contours of [the] right" Talley asserts are not clearly

16

established. *Ashcroft*, 563 U.S. at 741. Thus, we affirm the district court's dismissal of Talley's procedural due process claim.[4]

## C. Substantive Due Process

As with her other claims, Talley argues that the district court wrongly dismissed her substantive due process claim. She contends that she has sufficiently alleged that the officials' actions were "so arbitrary and capricious as to shock the conscience." Op. Br. at 27. Specifically, she says that the board members "had no written process for recoupment;" "unilaterally and without reference to any written rules or policies" commenced recoupment; and could take as little as 10% or as much as 100% of her pension amount "at their option." Op. Br. at 26–27.

To succeed on a substantive due process claim, a plaintiff must demonstrate "(1) that he had property or a property interest; (2) that the state deprived him of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency." *Quinn v. Bd. of Cnty. Comm'rs for Queen Anne's Cnty., Md.*, 862 F.3d 433, 443 (4th Cir. 2017) (emphasis in original) (cleaned up). Talley does not come close to alleging facts that meet this standard.

The bar to successfully state a substantive due process claim is high. Substantive due process is a "narrow" protection that "covers only state action which is 'so arbitrary

---

[4] Since the right Talley asserts to have been violated is not clearly established, we need not address Talley's allegation that the lack of pre-deprivation process violated her procedural due process right.

and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies.'" *Sylvia Dev. Corp. v. Calvert Cnty, Md.*, 48 F.3d 810, 827 (4th Cir. 1995) (quoting *Rucker v. Hartford Cnty*, 946 F.2d 278, 281 (4th Cir. 1991)). Where, as here, the alleged deprivation "is amenable to 'rectification by . . . post-deprivation state remedies,'" the officials' actions are "hardly arbitrary." *Mora v. City of Gaithersburg*, 519 F.3d 216, 231 (4th Cir. 2008) (quoting *Rucker*, 946 F.2d at 281). Talley does not engage at all with the fact that she received both pre-deprivation internal review and a post-deprivation hearing before an ALJ at which she was able to contest the fact and amount of the recoupment. But it is undisputed that she received both. Further, Talley does not allege or argue that the deprivation she complains about—recoupment of overpaid benefits—could not be rectified via the post-deprivation hearing.

Instead, Talley makes two primary arguments. First, she complains that the officials' decision to withhold only 10% instead of 50% of each monthly benefit check indicates overbroad discretion. But a substantive due process claim requires government action that is so illegitimate that no process could cure it. Talley does not allege facts that show the officials' recoupment efforts—even assuming they were initially as arbitrary as she alleges—could not be, and were not, rectified or cured by the ALJ hearing she received. Besides, any flexibility in the recoupment system inured to Talley's advantage. At first, her benefit checks were reduced by 50%. Later, they were reduced by only 10%.

Second, Talley contends that "the manner in which the United States and several of the individual States address overpayments" shows that the defendants' actions were

18

arbitrary and violated her substantive due process rights. Op. Br. at 33. But again, what other states do is not the appropriate test. Rather, our inquiry is whether Talley plausibly alleges that the defendants took actions so arbitrary and irrational that even post-deprivation remedies cannot cure them. *See Sylvia Dev. Corp.*, 48 F.3d at 827. As explained above, she has not made that argument.

We see no error in the district court's holding that Talley has failed to state a substantive due process claim.

### D. Equal Protection

Finally, Talley argues that the district court erred in dismissing her equal protection claim for two reasons. First, she contends that she "has a fundamental right to the full amount of her pension." Op. Br. at 52. Second, she insists that there was no rational basis for beginning recoupment efforts using arbitrary percentages without set standards or rules governing the process.

Equal protection requires a plaintiff to allege that he or she "has been treated differently from others who are similarly situated" in light of "the appropriate level of constitutional scrutiny." *Doe v. Settle*, 24 F.4th 932, 939 (4th Cir. 2022). And that different treatment must be worse than the similarly situated comparative group. *See Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020) (quoting *Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017)) (stating that a plaintiff bringing an equal protection claim must allege "that [s]he has been treated differently from others . . . and that the *unequal* treatment was the result of intentional or purposeful discrimination" (emphasis added)). As an initial matter, Talley did not allege facts showing that she was treated worse off than anyone else. In fact,

19

her allegation that the defendants treated those who hired attorneys to challenge recoupment efforts or pushed back on the state's efforts differently from those who did not, even if true, meant she was treated better than others, not worse. Next, the district court correctly held that Talley had not alleged facts that required application of heightened scrutiny. She did not allege that she belongs to a suspect class. Nor has she explained, through argument or cited authority, how the right to one's pension benefits is a fundamental right.[5] In fact, the few cases that have touched on the question of whether individuals have a fundamental right to government benefits—including retirement benefits—suggest that they do not. *See Thompson v. Walker*, 758 F.2d 1004, 1009 (4th Cir. 1985) (holding that a limitation on judges' ability to receive retirement benefits if they practiced law in the Commonwealth of Virginia did not violate equal protection partly because no fundamental right was being interfered with); *see also Dandridge v. Williams*, 397 U.S. 471, 484 (1970) (stating that a challenge to Maryland's welfare system did not "affect[] freedoms guaranteed by the Bill of Rights . . .").

Thus, to the extent Talley has even alleged different treatment, the district court correctly held that rational basis review applies here. So, we are left to address Talley's

---

[5] Fundamental rights include the right to privacy, the right to vote, the right of interstate travel, certain first amendment rights, and the right to procreate. *See Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 n.3 (1976). Any such right must be "deeply rooted in this Nation's history and tradition." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)); *see also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33 (1973) (stating that fundamental rights are those "explicitly or implicitly guaranteed by the Constitution"). And Talley makes no real argument that the right to one's pension benefit is deeply rooted in our Nation's history or tradition.

argument that defendants "have no rational basis for distinguishing between various overpaid beneficiaries and determining . . . how much, when, and by what method recoupment will occur." Op. Br. at 55.

Rational basis review requires the individual challenging a law to "negate[] every conceivable basis which might support the legislation." *Settle*, 24 F.4th at 944 (quoting *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008)). In other words, to prevail under rational basis review, Talley must allege facts that show there is no "rational relationship between the disparity of treatment" alleged and "some legitimate governmental purpose." *Id.* at 943 (quoting *Heller v. Doe*, 509 U.S. 312, 320–21 (1993)) (holding that there is no "place in rational-basis review to question the wisdom or logic of a state's legislation" and that "rough line-drawing, even 'illogical' or 'unscientific' line drawing, is often necessary to governing").

Importantly, much of Talley's briefing misapprehends the burden of proof under rational basis review. "Under rational basis review . . . those attacking the rationality of the rule have the burden to negative every conceivable basis which might support it." *Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Lynch*, 826 F.3d 191, 196 (4th Cir. 2016) (cleaned up). Thus, to the extent that Talley suggests the defendants must themselves provide a "plausible reason" for their decision to recoup overpaid benefits in different percentages and using different "means and methods," she is incorrect. Op. Br. at 56.

And Talley otherwise fails to explain why the defendants have no rational basis for distinguishing between overpaid individuals and seeking recoupment in varying amounts. As the district court noted, the defendants had a legitimate interest in recouping overpaid

21

retirement benefits. Thus, the only question is whether the defendants' process for recouping overpayments by reducing benefit checks in varying amounts is rationally related to that interest. The only counterargument Talley makes is that the defendants pursued recoupment in a way that was discretionary and resulted in different treatment for different people. But the defendants argue that responding to different individuals differently depending upon their requests or the requests of their attorneys merely "shows appropriate flexibility and passes rational-basis scrutiny." Resp. Br. at 45. In the absence of any meaningful arguments to the contrary from Talley, and in light of the high bar set by the many opinions applying rational-basis review, we find no error in the district court's holding. The defendants surely have a legitimate governmental purpose here—recouping overpaid pension benefits. And treating Talley "differently" from other individuals by evaluating her particular circumstances and requests and accordingly lowering her recoupment percentage from 50% to 10% bears a rational relationship to that legitimate purpose. The state is ensuring recoupment of those overpaid benefits while being flexible in light of individuals' varying circumstances, which satisfies the rational basis test. As a result, we affirm the district court's conclusion that Talley has not alleged an equal protection violation.

### E. Talley's Motion for Leave to Amend

Talley also challenges the district court's denial of her motion for leave to amend her complaint, arguing that she was late in seeking to add the new plaintiffs because of discovery failures on the part of defendants.

22

In her motion for leave to amend, Talley sought to add four plaintiffs to the lawsuit, each of whom she contends has been denied due process by the state's recoupment procedures. The district court denied Talley's motion because Talley filed it four months after the deadline in the scheduling order for amending pleadings had passed and did not file a motion to amend the scheduling order until after she filed her motion to amend her complaint. The district court also held that Talley did all of this without showing good cause to modify the scheduling order as required by Federal Rule of Civil Procedure 16(b). In reaching this conclusion, it explained that Talley knew "well-before the expiration of the deadline to seek to amend pleadings" of "at least two of the plaintiffs she presumably now seeks to add to her complaint," based on an email sent by plaintiff's counsel. J.A. 470.

We review the court's denial of her motion for leave to amend her complaint for abuse of discretion. *See Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). On appeal, Talley does not contradict the district court's finding that she knew about at least two of these plaintiffs before the deadline passed—she simply argues that her approach of seeking to add all plaintiffs at once is "more efficient." Op. Br. at 58. But that is not the point. The district court entered a scheduling order, which it is allowed to enforce. Talley has offered no argument that the district court abused its discretion in holding that no good cause existed to warrant modifying the scheduling order, and we find none. [6]

---

[6] The district court also held that Talley's motion was (1) procedurally deficient due to her failure to attach both a proposed amended pleading and a document showing how the amended pleading differed from the original in accordance with local rules and (2) failed to satisfy Federal Rule of Civil Procedure 20's limitations on joinder of parties. Because we affirm on the basis of the court's Rule 16(b) holding, we do not address whether

## III.

To sum up our ruling, Talley received an unexpected windfall when she began receiving inflated monthly benefit checks. Having enjoyed the $86,173.93 of extra cash she received over eight years, she naturally did not want North Carolina to recoup it. But the state had a statutory obligation to do so. And recouping its overpayment under North Carolina law did not violate Talley's constitutional rights. Talley's procedural due process claim against the defendants in their official capacities is barred by Eleventh Amendment immunity; her procedural due process claim against the defendants in their individual capacities is barred by qualified immunity; she has failed to state a substantive due process claim; and she has similarly failed to state an equal protection claim. Lastly, the district court did not abuse its discretion in denying Talley's motion for leave to amend her complaint. Accordingly, the district court's judgment is,

*AFFIRMED.*

---

Talley's pleading was procedurally deficient or whether it runs afoul of Rule 20's joinder requirements.

24